# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br>vs.<br><br>JOSE SALUD CASTRO,<br><br>          Defendant. | Case No. 2:19-cr-00295-GMN-NJK<br><br>REPORT AND RECOMMENDATION |

This matter is before the Court on the question of Defendant Jose Salud Castro's competency to stand trial.

## I.   BACKGROUND

On November 12, 2019, a federal grand jury sitting in Las Vegas, Nevada issued an indictment charging Defendant with one count of conspiracy to commit mail fraud, in violation of 18 U.S.C. § 1349, and twelve counts of mail fraud, in violation of 18 U.S.C. § 1341. Docket No. 1. On November 14, 2019, Defendant appeared in court for his initial appearance and arraignment and plea. Docket No. 38. The Court appointed counsel to represent Defendant and ordered him released pending trial on a personal recognizance bond with conditions. *Id*. *See also* Docket No. 42.

On February 17, 2022, Defendant filed a motion for competency evaluation. Docket No. 258. On March 7, 2022, after the motion was fully briefed, the Court noted that Defendant offered to provide medical records in support of his motion and allowed him to do so, under seal, by 5:00 p.m. that day. Docket No. 285. On March 9, 2022, the Court denied Defendant's motion for

competency evaluation because he failed to provide objective medical records demonstrating his medical history or worsening conditions, despite the opportunity to do so provided by the Court. *See* Docket No. 293.

On May 27, 2022, Defendant filed a second request for a competency evaluation, this time in the form of a motion for psychiatric or psychological examination to determine competency. Docket No. 358. In support of his motion, Defendant submitted the treatment notes from fifteen neurology appointments from May 2020 to April 26, 2022. Docket No. 358-1. On June 13, 2022, after the motion was fully briefed,[1] the Court denied Defendant's request. Docket No. 365. Specifically, the Court found that the treatment notes:

> indicate that Defendant was observed having symptoms indicating a Parkinson's disease diagnosis beginning in May 2020. *Id.* at 3-4. The treatment notes indicate initial worsening of his tremor and indicate that he had some problems with memory loss beginning in September 2020, followed by his symptoms improving after he began a new regime of medications to help alleviate them. *Id.* at 5-17. As of March 3, 2022, the notes indicate that Defendant's symptoms had not changed and were being managed with his medication regimen of Mirapex and Sinemet. *Id.* at 17. The most recent medical visit occurred on April 26, 2022, and indicated that a new medication, Cogentin, had worsened his memory loss. *Id.* at 20. The same treatment notes show that, on the day of the visit, Defendant had no abnormal signs in his neurological system, had normal mood and affect, and had normal memory. *Id.* at 21. These notes constitute the only evidence Defendant provides to the Court about his competency.

Docket No. 365 at 3-4.

The Court found that the treatment notes indicate that Defendant's memory loss was mild or periodic and that no representations had been made to the Court that the memory issues affect

---

[1] The Court shortened the deadlines in order to handle the issue expeditiously. Docket No. 361. The United States timely responded to Defendant's motion, Docket No. 364; however, Defendant did not file a reply. *See* Docket.

2

Defendant's ability to understand the proceedings against him or to participate in his defense. *Id.* at 4.

On August 6, 2022, Defendant filed his third motion for psychiatric evaluation. Docket No. 390.[2] In support of his motion, Defendant submitted the report of Dr. Mark J. Chambers, who examined Defendant at his attorneys' request, and found that he was not competent to stand trial. Docket No. 391-1.

On August 31, 2022, the Court held a hearing on Defendant's motion for competency evaluation. Docket No. 421. *See also* Docket No. 390. Based on the representations made by both parties, the Court granted Defendant's motion. Docket No. 421. On September 14, 2022, after an evaluation of Defendant was completed, the Court found by a preponderance of the evidence that Defendant was "presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or assist properly in his defense." Docket No. 463 at 1. The Court therefore committed Defendant to the custody of the Attorney General to be hospitalized in a suitable facility to determine whether his competency could be restored. Docket Nos. 462, 463.

On April 20, 2023, in response to a letter the Court received from the facility in Missouri where Defendant was housed at the time, the Court held a status conference. Docket No. 736. *See also* Docket No. 716. At the hearing, the United States represented that it was in the process of finalizing a contract for a forensic neuropsychologist to examine Defendant. Docket No. 736.

On May 15, 2023, the United States represented to the Court that the forensic evaluation report would be finished shortly and defense counsel represented that they were in the process of

---

[2]   Defendant inaccurately docketed the motion as his second motion though, in reality, it was his third. *See* Docket.

retaining a forensic neuropsychologist of their own. Docket No. 777. The parties agreed that, since the evaluation was completed, no reason existed for Defendant to remain in custody. *Id*. As a result, the Court released Defendant on a personal release bond with numerous conditions, including the condition that he was committed to the third-party custody of Gardenia Castro, his daughter. *Id*. Prior to releasing Defendant on these conditions, the Court placed Ms. Castro under oath and informed her of all the obligations of a third-party custodian, as well as some consequences that could result if she failed to fulfill these obligations and Ms. Castro agreed to comply with the obligations. *Id*. *See also* Docket No. 778. The Court further set a competency hearing for Defendant for August 22, 2023. Docket No. 777. This hearing was later continued, at the request of the parties, to November 1, 2023. Docket No. 816.

On June 5, 2023, the forensic psychologist at the facility in Missouri where Defendant had been housed wrote a report finding that Defendant is now competent. Docket No. 900. The report included a Certificate of Competency, signed by the warden of the facility. Docket No. 900-1.

Since that date, some of Defendant's co-defendants proceeded to trial and were found guilty. On September 15, 2023, the Court sentenced two of Defendant's brothers and son-in-law to lengthy prison sentences. Docket No. 888 at 3. These three defendants fled the jurisdiction. *Id*. Further, on September 26, 2023, Defendant's daughter and third-party custodian informed United States Pretrial Services that Defendant had been missing since September 20, 2023. *Id*. A warrant has been issued for Defendant's arrest and his whereabouts remain unknown. *Id*. at 3-4. All four remain fugitives.

On October 12, 2023, Defendant's attorneys filed a motion to vacate the November 1, 2023, competency hearing. Docket No. 882. Defendant's attorneys cite to 18 U.S.C. §4247(d), which states, in relevant part, that the person whose mental condition is the subject of the hearing

4

"… shall be afforded an opportunity to testify, to present evidence, to subpoena witnesses on his behalf, and to confront and cross-examine witnesses who appear at the hearing." *See* Docket No. 882 at 3. Defendant's attorneys stated that, therefore, the hearing should not occur without Defendant present. *Id*. The motion further asked the Court to vacate the hearing because, since Defendant was missing, he did not appear for the brain scan his expert ordered. *Id*. at 2.

On October 19, 2023, the United States responded that proceeding with the competency hearing as scheduled serves the interests of justice. Docket No. 888. The United States submitted that Defendant made the decision to flee with his family members "rather than face the prospect of spending years in prison." *Id*. at 4. Further, the United States submitted that Defendant's expert can testify at the hearing whether Defendant is present or not and, if she thinks other tests should have been run, she can testify to those tests and the reasoning behind her opinion. *Id*. In any event, the United States noted, defense counsel received a copy of an MRI completed while Defendant was in custody and the defense expert ordered the MRI only to see if it would alter her opinion. *Id*. Additionally, the United States submitted that Defendant has been afforded the opportunity to attend his hearing and to testify and has waived those rights by voluntarily absenting himself from the proceedings. *Id*. at 4-5. Finally, the United States submitted that it appears that Defendant "has perpetrated a fraud on the Court by pretending to have dementia while planning and executing his escape from justice. This is consistent with his long history of fraud and malingering." *Id*. at 5.

On October 20, 2023, the Court denied the motion to vacate the competency hearing. Docket No. 891. In so doing, the Court stated that:

> In compliance with the relevant statutes, this Court set a hearing to determine whether Defendant is competent to stand trial. The Court allowed the parties a lengthy period of time to obtain experts so that

>both parties would have a full opportunity to present evidence. Defendant was well aware of these activities, as he was ordered to be present in court at every hearing. Defendant has now voluntarily chosen to violate his pretrial release conditions and is currently considered an absconder.
>
>The competency hearing is currently set for November 1, 2023. Defendant is represented by two attorneys that the Court has appointed for him. Further, the Court is, by holding the hearing, affording Defendant the "opportunity to testify, to present evidence, to subpoena witnesses on his behalf, and to confront and cross-examine witnesses who appear at the hearing." 18 U.S.C. § 4247(d). If Defendant chooses to remain an absconder and not appear at the hearing, his choice does not change the fact that he has been afforded all opportunities that the statute requires.

*Id*. at 3.

On November 1, 2023, the Court held Defendant's competency hearing. Docket No. 901. A Spanish interpreter was ready in case Defendant appeared, though he did not. *Id*. Both of Defendant's attorneys were present for the hearing, as was the attorney for the United States. *Id*. The United States called Dr. Robert L. Denney as its first and only witness. *Id*. After Dr. Denney testified to his qualifications, the United States moved to qualify him as an expert witness. *Id*. The defense was given the opportunity to cross-examine Dr. Denney about his qualifications and declined. *Id*. Further, the defense was given the opportunity to object to the qualification of Dr. Denney as an expert and declined. *Id*. Pursuant to a motion filed by the United States and not opposed by the defense, Docket Nos. 895, 897, Dr. Denney's direct examination testimony was presented via the entry into the record of his report regarding his examination of Defendant and opinion regarding Defendant's competency to stand trial. Docket Nos. 901, 895-1. The defense was afforded the opportunity to cross-examine Dr. Denney but declined to do so. Docket No. 901. After the United States rested, the Court afforded the defense the opportunity to present its case. *Id*. The defense did not call any witnesses and, instead, rested. *Id*.

## II. ANALYSIS

The Supreme Court of the United States has "repeatedly and consistently recognized that 'the criminal trial of an incompetent defendant violates due process.'" *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996) (quoting *Medina v. California*, 505 U.S. 437, 453 (1992)). "Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so." *Cooper*, 517 U.S. at 354 (internal citation omitted). "[A] person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to trial." *Drope v. Missouri*, 420 U.S. 162. 171 (1975).

The treatment of offenders suffering from a mental disease or defect has been codified in the Federal Criminal Code. 18 U.S.C. §§ 4241-48. If a question is raised concerning whether a defendant is competent to stand trial, the Court first determines whether that defendant suffers from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense. 18 U.S.C. §§ 4241(a) and (d). When the Court has reasonable cause to believe a defendant is suffering from a mental disease or defect rendering him unable to understand the nature and consequences of the proceedings against him or assist properly in his defense, the Court shall conduct a hearing to determine whether that defendant is competent to stand trial. 18 U.S.C. §4241(a).

A defendant is deemed competent to stand trial if he "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and ... has a rational as

7

well as factual understanding of the proceedings against him." *Dusky v. United States,* 362 U.S. 402, 402 (1960) (per curiam) (internal quotation marks omitted). *See also United States v. Gastelum-Almeida*, 298 F.3d 1167, 1171 (9th Cir. 2002). "Whether a defendant is capable of understanding the proceedings and assisting counsel is dependent upon evidence of the defendant's irrational behavior, his demeanor in court, and any prior medical opinions on his competence." *Miles v. Stainer*, 108 F.3d 1109, 1112 (9th Cir. 1997).

The United States has the burden of demonstrating by a preponderance of the evidence that the defendant is competent to stand trial. *United States v. Frank*, 956 F.2d 872, 875 (9th Cir. 1991). The test that must be applied in determining competency to stand trial is set forth in *Dusky*: "[I]t is not enough for the district judge to find that 'the defendant [is] oriented to time and place and [has] some recollection of events,' but that the "test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding – and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky*, 362 U.S. 402-03.

While a finding of incompetency is predicated on the existence of a mental disease or defect, the standard for evaluating a defendant's competency to stand trial is not a medical inquiry; rather, it is a legal determination. *United States v. Makris*, 535 F.2d 899, 908 (5th Cir. 1976). In determining competency, the Court may rely on a number of factors, including medical opinions and the Court's own observation of the defendant. *See Torres v. Prunty*, 223 F.3d 1103, 1109 (9th Cir. 2000).

The evidence submitted at the competency hearing demonstrated that Dr. Denney is board certified in both clinical neuropsychology and forensic psychology. He has conducted thousands of competency evaluations in his professional career, which includes over 11 years working at the

U.S. Medical Center for Federal Prisoners as a licensed psychologist and his current job of over seven years as a clinical neuropsychologist at the Missouri Memory Center. Dr. Denney examined Defendant on May 3 and 4, 2023, and administered seven different psychological and neuropsychological tests. Docket No. 895-1 at 2-3.[3] He also reviewed the indictment in the instant case and a great deal of Defendant's medical information. *Id*. at 3-5. Further, Dr. Denney engaged in interviews with Defendant's daughter and attorney, as well as behavioral observations, tests administered at the facility, and a competency restoration group participation summary document. *Id*. at 4-5.

Dr. Denney set out in detail his meetings with Defendant, as well as his testing and observations and his review of Defendant's medical history. *Id*. at 5-21. Dr. Denney found that Defendant failed the Medical Symptom Validity Test ("MSVT"). *Id*. at 21. Specifically, Dr. Denney found that Defendant "placed the easiest portions of the test below standard cutoffs and did not create a pattern of scores consistent with genuine dementia." *Id*. at 21-22. Further, Dr. Denney found that, "[i]n addition to failing to meet the diagnostic rules for potential genuine memory disorder, [Defendant] produced order violations … [which] means he performed worse on easier subtests that [sic] he did on more difficult subtests, a situation that does not occur when the patient data are a valid reflection of genuine memory disorder." *Id*. at 22. Dr. Denney stated that Defendant performed "much worse than patients with even severe dementia on the easier portions of the test … yet he performed better than those patients on the most difficult portion of the test … [which] is commonly seen in cases of people attempting to appear disingenuously impaired." *Id*. at 23.

---

[3] The Court cites to the CM/ECF pagination, rather than the pagination of the original document.

1    Additionally, Dr. Denney found that Defendant failed the Non-Verbal Symptom Validity
2 Test ("NV-MSVT"), which is a test that presents pictures and asks the examinee to remember
3 them. *Id*. at 23. Dr. Denney found that the results of this test indicated that Defendant
4 "intentionally tried to appear disingenuously cognitively impaired." *Id*. Defendant "performed
5 well below the most severely impaired dementia individuals on the easy portion" of the test. *Id*.
6 Further, Dr. Denney stated that, on one portion of the test, Defendant's score was so low that it
7 was below random or, in other words, "he knew the correct answers but intentionally chose the
8 incorrect answers." *Id*. Dr. Denney stated that performing in this manner has been termed the
9 "'smoking gun of intent' when it comes to malingering detection. [Defendant's] score would have
10 occurred less than 6 times out of 100 by chance alone." *Id*. at 23-24. Dr. Denney also found that
11 Defendant had order violations and that his profile of scores was not consistent with profiles
12 created by genuine groups of dementia patients. *Id*. at 24. Dr. Denney found that Defendant's
13 results on this test are "strongly suggestive of malingering" and indicated he was "attempting to
14 appear disingenuously cognitively impaired." *Id*. at 24-25.

15    Defendant also completed the nonverbal portion of the Validity Indicator Profile ("VIP"),
16 which is a forced-choice two alternative test where he had to choose which design or pattern best
17 fits the stimulus pattern or design. *Id*. at 25. Dr. Denney found that Defendant produced an
18 "Invalid/Irrelevant response pattern, which means he did not attempt to perform well on the
19 measure." *Id*. The results of this test, Dr. Denney found, "further support the conclusion that
20 [Defendant] was attempting to appear severely cognitively impaired." *Id*.

21    Further, Defendant was administered the Memory Complaints Inventory ("MCI"), on
22 which he made self-reported symptoms of memory impairment. *Id*. at 26. Dr. Denney found that
23

Defendant's self-reported severe problems with memory were far worse than those found among genuine dementia patients. *Id*.

Dr. Denney found that the test results "indicate that "Defendant] was attempting to appear disingenuously cognitively impaired on cognitive testing during this examination, and he was exaggerating his self-report regarding memory." *Id*. at 26-27. As a result, Dr. Denney stated that the scores on his neurocognitive tests are not a valid reflection of Defendant's genuine cognitive abilities and can only be relied on to demonstrate a minimum level of ability. *Id*. at 27. Specifically, Dr. Denney set out Defendant's results on these neurocognitive tests in his report. *Id*. at 27-28.

Dr. Denney found that Defendant has a subtle resting tremor and has had essential tremor for many years, which runs in his family, and opined that Defendant possibly developed Parkinson Disease ("PD") a few years earlier. *Id*. at 29. However, Dr. Denney found that Defendant's presentation and test data indicate that he is "attempting to embellish PD symptoms, and in particular, grossly exaggerate cognitive compromise." *Id*. Dr. Denney engaged in certain exercises to determine whether Defendant has PD and, if so, how severe his disease is, as he sets out in detail in his report. *Id*. at 29-30. Dr. Denney found that Defendant may genuinely have PD and, if he does, it is currently mild. *Id*. Dr. Denney also found that Defendant "demonstrated he was attempting to manipulate [Dr. Denney's] findings during his motor examination to look like more severe Parkinson findings." *Id*. at 30.

Dr. Denney stated that PD "does not result in severe cognitive problems and dementia until very late in the course of the disease" in most cases. *Id*. Although about 25% of PD cases will have dementia earlier in the course of the disease, Defendant demonstrated that he does not have that dementia. *Id*. at 31. As one example, Defendant could not name pictures of animals, which

he apparently believed was a memory task but is a language-dependent task, but was able to name three animals with no difficulty, which is a memory task. *Id*. Further, Dr. Denney stated that Defendant repeatedly "brought attention to his 'severe memory problem,'" but often demonstrated memory in the process of drawing attention to his alleged poor memory, such as remembering to ask an attendant to write a note for him to remember to bring glasses for him the next day more than 30 minutes after saying he would do so. *Id*. Additionally, Defendant "failed cognitive validity tests that are designed to identify feigning and exaggeration but be insensitive to genuine severe cognitive compromise." *Id*. Dr. Denney noted that Defendant's performance during the MSVT and NV-MSVT tests was not consistent with dementia and, significantly, his performance on the NV-MSVT "was so poor that it indicated he intentionally tried to look demented. In doing so, he demonstrated his memory because he had to have known the correct answer in order to choose the wrong answer more often than what would have likely occurred by chance." *Id*. Dr. Denney stated that Defendant's self-reported memory complaints were exaggerated compared to genuine dementia patients when, in fact, "people who have genuine moderate to severe memory problems generally lose their awareness of the problem as well; they certainly do not draw attention to the memory difficulties repeatedly." *Id*. at 32. Dr. Denney, therefore, stated that the results indicated that Defendant was malingering neurocognitive dysfunction. *Id*.

During Defendant's hospitalization at the facility, he completed 9 out of ten competency restoration educational classes. *Id*. at 41. When he was asked questions related to competency, Defendant answered in a way that would indicate he did not understand his case or legal facts, often stating he did not know or did not remember. *Id*. at 33-40. Further, when asked if he felt he was trial competent, Defendant said no, because he does not know anything. *Id*. at 40. Nonetheless, when Defendant was administered the Denney Competency Related Test, a multiple-

choice questionnaire of basic legal issues and procedures, he correctly answered 38 out of 45 questions. *Id.* at 41. Defendant's performance on this test is "well above the random range, suggesting he understood the majority of competency related basic facts addressed in the questionnaire." *Id.* Dr. Denney stated that Defendant's performance on this test, as well as his performance during the competency restoration classes he completed, "suggest he knows more about competency related material than he admits." *Id.*

Dr. Denney found that:

> The overall clinical picture suggested that while [Defendant] has essential tremor, and likely has Parkinson disease, he was also clearly exaggerating memory and knowledge deficits. His behavior during testing and interviews suggested to me that he knows much more about his legal case than he [is] willing to concede. Further, the reliable clinical signs he demonstrated related to Parkinson disease suggested the illness is still rather mild (assuming he truly has it). Consequently, it is my opinion that he is not only malingering memory and cognitive deficits, but that he is intentionally attempting to appear disingenuously not competent. It is my opinion that he could learn any important information that he may not know and could assist in his own defense if he chose to do so.

*Id.* at 42.

Dr. Denney further stated that it is his opinion:

> to a reasonable degree of scientific certainty that Jose Salud Castro does not suffer from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in [his] defense. He is competent to proceed.

*Id.*

In determining prognoses for Defendant, Dr. Denney stated:

> Malingering is not a mental illness, per se, and warrants no specific prognosis. However, it is also my opinion that Mr. Castro has demonstrated effectively the ability to confuse examiners in a

> manner that has succeeded in delaying his criminal prosecution. The presence of genuine neurological problems provides him with the fuel to fire the malingering deception. Given this success, it is likely he will continue to attempt, what I believe to be a ruse.
>
> Essential familial tremor is a condition that is not expected to resolve. It will likely worsen over the course of time on a very gradual basis. There are medications that can settle down the intention tremor, but he does not appear to be prescribed any of them currently. He may benefit from a consideration for that treatment. Regardless, intention tremor would have no bearing on his competency.
>
> Parkinson disease is a slowly progressive neurodegenerative disease that will eventually cause profound motor incapacity. Near the end of the course, after he is profoundly affected by motor incapacity, he will develop marked cognitive compromise. It is only at this time that I believe his competency to proceed would be genuinely and significantly affected. In 1967, five stages of PD based on the level of clinical disability were described. These stages help describe the clinical progression, largely based on motor-related abilities. On this scale, stages 1 and 2 represent early-stage, 2 and 3 mid-stage, and 4 and 5 advanced-stage PD. It [is] not uncommon for people to go through these stages over the course of 20+ years, but there are instances where the disease progresses faster as well. In the majority of cases, people do not develop incapacitating cognitive deficits until stage 4 or 5, although depression can be a major concern much earlier. Mr. Castro appears to have potentially developed PD about five years ago. Given the typical natural course of the disease, I would not expect substantial cognitive deficits to interfere with his functioning within the next 10 years. I concede this prognosis is a rough estimate.

*Id*. at 42-43.

Finally, though Defendant voluntarily absented himself from the competency hearing, the Court has had several opportunities to observe Defendant when he has been present in the courtroom. The Court noted that, once the parties started discussing competency, Defendant's tremors appeared to become more pronounced when the Court turned its attention to him. Further, when the Court was determining whether to release Defendant from custody after he returned to

14

this District from competency restoration, the Court asked Defendant if he understood all of the conditions it had previously placed on him. Defendant said he did not understand; however, when the Court said it could not release him, Defendant immediately changed his response and said that he understood all of the conditions of release and would comply with them. These observations appear to be consistent with Dr. Denney's findings.

The Court's observations of Defendant, combined with the credible report and testimony of Dr. Denney, convince the Court that Defendant has been malingering memory and cognitive defects to convince the Court and his examiners that he suffers from cognitive dementia. Instead, the Court finds that Defendant, as found by Dr. Denney, is malingering memory and cognitive deficits and is intentionally attempting to appear disingenuously not competent. The Court finds, instead, that Defendant does not suffer from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his own defense. The Court finds that Defendant meets the *Dusky* test. The Court finds that Defendant is competent to proceed to trial.

## III. CONCLUSION

Accordingly, **IT IS HEREBY RECOMMENDED** that Defendant Jose Salud Castro be required to stand trial based on the undersigned's findings that he is competent to do so.

DATED: November 14, 2023.

_____
NANCY J. KOPPE
UNITED STATES MAGISTRATE JUDGE

**NOTICE**

This report and recommendation is submitted to the United States district judge assigned to this case pursuant to 28 U.S.C. § 636(b)(1). A party who objects to this report and recommendation must file a written objection supported by points and authorities within fourteen days of being served with this report and recommendation. Local Rule IB 3-2(a). Failure to file a timely objection may waive the right to appeal the district court's order. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).